UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHANEISE N. SANDERS, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | 19-cv-04656 |
| | ) | |
| v. | ) | Judge Edmond E. Chang |
| | ) | |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Shaneise Sanders brings this employment discrimination suit against her former employer, the Chicago Transit Authority. R. 16, Am. Compl. ¶¶ 1,6.[1] In the Amended Complaint, Sanders alleges that she was harassed by coworkers and supervisors because of her sex and that she was the victim of unwelcome sexual advances from a supervisor. *Id.* ¶¶ 77(a)-(b). Sanders also claims that she was retaliated against for complaining about the discrimination.[2] *Id.* ¶ 93. In addition to those discrimination claims, which she brings under Title VII, Sanders also brings a *Monell* claim under 42 U.S.C. § 1983 and a state law claim for intentional infliction of emotional distress. *Id.* ¶ 1. The CTA has moved to dismiss all claims. R. 24, Mot. Dismiss ¶¶ 5-10. Also, the CTA has moved to strike the request for punitive damages.

---

[1]This Court has subject matter jurisdiction over the federal claims in this case under 28 U.S.C. § 1331 and supplemental jurisdiction over the state-law claim under 28 U.S.C. § 1367. Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

[2]Sanders has alleged "Retaliatory Discharge" in the Amended Complaint but did not specify what statute she is proceeding under. Am. Compl. ¶¶ 92-96. The Court assumes for the purposes of this motion that she is pursuing a Title VII retaliation claim.

*Id.* ¶ 13. For the reasons explained below, the CTA's motion to dismiss is granted in part and denied in part, and the request to strike the punitive damages is granted.

## I. Background

For purposes of this motion, the Court accepts as true the allegations in the Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Between April 2018 and April 2019, Sanders worked as a part-time Customer Service Assistant for the CTA. Am. Compl. ¶¶ 4, 68. She started having trouble with her coworkers immediately after starting the job. *Id.* ¶¶ 9-11. For instance, the first time that Sanders met one of her coworkers, Tamara Irby, Irby remarked that she had heard that Sanders was educated and acted "proper, like she was a white female." *Id.* ¶ 11. Then, in June 2018, Sanders and Irby got into an argument that escalated into Irby snatching a phone from Sanders and threatening to harm her. *Id.* ¶ 10. Sanders called both her supervisor and the police to report the incident. *Id.* When Sanders's manager, Ashley Cooper, arrived on the scene, Cooper convinced Sanders to let the CTA handle it instead of the police. *Id.*

Later that month, Sanders met with her supervisors and a union representative to discuss the altercation with Irby. Am. Compl. ¶¶ 12-13. During the meeting, Sanders raised concerns about not feeling protected at work. *Id.* It was right after this June 2018 meeting that Sanders first met Anthony Winston, a senior manager at the CTA. *Id.* ¶¶ 16-17. Sanders was standing outside the office, visibly upset, when Winston approached her and suggested they "hang out, have a drink and talk." *Id.* ¶¶ 14-15, 21. Over the course of the next two months, Winston made several

2

attempts to meet up with Sanders both in public and at his home. *Id.* ¶¶ 21, 27, 29-30. Sanders also alleges that Winston's communications with her were inappropriate because he asked her to "send [him] a pic for [his] screen saver," and told her on one occasion that he was "thinking of [her]." *Id.* ¶¶ 24, 26. Sanders alleges that she "heard a lot of talk among co-workers that sexual harassment was rampant in the CTA environment," and she learned from a union representative that Winston had at least one other allegation of sexual harassment against him. *Id.* ¶¶ 14, 61.

Sanders refused all of Winston's advances and requests to meet up. Am. Compl. ¶¶ 25, 31-32. Afterwards, Winston's demeanor towards her changed. *Id.* ¶¶ 40-43. He was abrupt and rude when Sanders needed his help, and Sanders experienced an increase in bullying behavior from her coworkers and supervisors who were friends with Winston—namely, her coworkers Irby and Nakia Crawford, as well as Sanders's manager Richard Porter. *Id.* ¶¶ 43, 48-50. Specifically, Sanders alleges that she experienced "frequent hostile stares" from Porter. *Id.* ¶ 50.

In September 2018, Sanders complained about the bullying behavior to the CTA's Equal Employment Opportunity Unit. Am. Compl. ¶ 55. The very next day, she "again raised the harassment she was experiencing from some co-workers and the unsolicited advances by Mr. Winston," this time to a CTA manager and her union representative. *Id.* ¶ 57. Despite these complaints, Sanders alleges that no action was taken by the CTA to address any of the bullying behavior or unwelcome sexual advances. *Id.* ¶¶ 56, 64. Finally, in December 2018, Crawford yelled at Sanders and punched her at work. *Id.* ¶ 62. The next day, Sanders did not go in to work because

3

she felt depressed. *Id.* ¶ 64. When she sought both medical leave and another form of leave, both were denied. *Id.* ¶¶ 66-67.

In April 2019, Sanders brought a charge of discrimination to the Equal Employment Opportunity Commission, alleging harassment, sexual harassment, and retaliation. Am. Compl. ¶ 7; R. 16-1, Exh. A, April 2019 EEOC Charge. Sanders received a right to sue notice from the EEOC a couple weeks later. R. 16-1, Exh. B. In the same month that Sanders brought her charge and received notice of her right to sue, Sanders was fired from the CTA. Am. Compl. ¶ 68. Her dismissal letter stated that her discharge was based on a determination that she was absent without leave, but Sanders contends that she did not receive any sort of progressive discipline (as in, less drastic forms of discipline than discharge), even though that was supposed to be the CTA's policy. *Id.* ¶¶ 68, 70. In June 2019, Sanders filed another EEOC charge of discrimination, in which she alleged that she was discharged after filing the first EEOC charge and that she believed she was retaliated against for engaging in protected activity. R. 16-1, Exh. C, June 2019 EEOC Charge.

Now, Sanders alleges in this lawsuit that she was subjected to sexual harassment by coworkers and managers, and retaliation for reporting the harassment, all of which are prohibited under Title VII. Am. Compl. ¶¶ 77(a)-(b), 93. Sanders also brings a *Monell* claim under 42 U.S.C. § 1983 against the CTA, arguing that the CTA maintained a customary practice of condoning sexual harassment. *Id.* ¶ 90. Finally, Sanders brings a claim for intentional infliction of emotional distress

under Illinois common law, alleging that the CTA's failure to address the harassment caused her emotional harm. *Id.* ¶¶ 98-99.

## II. Standard of Review

A complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[3] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

### III. Analysis

### A. Title VII Claims

The Title VII claims are up first. Specifically, Sanders alleges that her coworkers and managers sexually harassed her, and that supervisor Anthony Winston made unwelcome sexual advances. Am. Compl. ¶ 77(b). Separately, she alleges that she experienced a hostile work environment because of her sex. *Id.* ¶ 77(a). And finally, she alleges that the CTA retaliated against her when she brought her concerns to the CTA and later to the EEOC. *Id.* ¶ 93. The CTA has moved to dismiss all three claims. The Court addresses each of CTA's arguments in turn.

### 1. Unwelcome Sexual Advances

The CTA initially moved to dismiss the unwelcome-advances claim, which was based on the alleged advances from her supervisor, Winston. Mot. Dismiss ¶ 6. As explained at the November 6, 2019 status hearing, though, the unwelcome sexual advances claim is sufficiently well pled. R. 28. During that status hearing, the Court explained that, viewing the facts in Sanders's favor, the allegations against Winston clearly state a claim for unwelcome advances. So that claim survives the CTA's motion to dismiss. *Id.*

### 2. Hostile Work Environment Because of Sex

Next, the CTA moves to dismiss the hostile work environment claim, arguing that Sanders has not adequately pled that the alleged harassment happened because of her sex. Mot. Dismiss. ¶ 5. To state this type of claim, a plaintiff must allege that (1) she was subject to unwelcome harassment; (2) the harassment was based on membership in a protected class; (3) the harassment was severe or pervasive so as to

6

alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833-834 (7th Cir. 2015). Here, the CTA takes issue with the second element, arguing that Sanders has not alleged a connection between the harassment and her sex. R. 25, Def.'s Br. at 4; *see* Am. Compl. ¶ 11. The CTA also argues that by failing to adequately address this argument in her response brief, Sanders has waived any response to the argument. R. 31, Def.'s Reply Br. at 5-6. For the reasons explained below, the Court agrees that Sanders has not adequately pleaded that the alleged work-environment harassment was because of her sex.

This is despite the principle that the pleading standards for Title VII claims are "undemanding" and allegations of discriminatory motivation do not need to be all that specific to survive a motion to dismiss. *See Tate v. SCR Med. Transp.*, 809 F.3d 343, 346 (7th Cir. 2015). For a harassment claim to be plausible, there needs to be *some* discernable connection to the protected class. Title VII is not a "general civility code" meant to remedy all workplace conflicts, but only those conflicts that are motivated by discrimination. *Smith v. Ill. Dep't of Transp.*, 936 F.3d 554, 561 (7th Cir. 2019).

Here, Sanders alleges that she was subjected to the following mistreatment: (1) her coworker Irby's comment that Sanders was educated and acted "proper, like she was a white female," Am. Compl. ¶ 11; (2) Irby's threat to harm her, *id.* ¶ 10; (3) an increase in bullying behavior from employees who were friends with Winston after

Sanders refused his advances (though Sanders does not specify what that behavior was), *id.* ¶ 49; (4) hostile stares from her manager Richard Porter, *id.* ¶ 50; and (5) being yelled at and punched by her coworker Nakia Crawford, *id.* ¶ 62.[4]

No doubt, if true, the alleged misconduct by her coworkers and supervisors is troubling, to say the least. But even an expansive reading of the Amended Complaint does not plausibly allege that the mistreatment happened *because of* Sanders's gender. The allegation that comes the closest is Irby's remark about Sanders being educated and acting "proper, like she was a white female." Am. Compl. ¶ 11. This remark does contain the word "female," but it ultimately does not suggest that Irby mistreated Sanders because she is a woman, nor would that remark standing alone qualify as severe or pervasive harassment. Irby's behavior appears to be the sort of personality conflict that Title VII does not protect against. *See Smith*, 936 F.3d 554, 560-61; *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014).

Given the sequence in which Sanders presents her facts, it appears as though Sanders is alleging that the behavior of Crawford, Porter, and other friends of Winston was in retaliation for Sanders's complaints about Winston's unwelcome sexual advances. *See* Am. Compl. ¶¶ 32-62. The Court will address that aspect of the alleged behavior in the next section. On the hostile work environment claim, though,

---

[4]Sanders does not distinguish which factual allegations support her hostile work environment claim and instead incorporates all paragraphs containing factual information at the beginning of her Title VII count. Am. Compl. ¶ 71. The Court has gathered all the factual allegations, excluding the allegations on unwelcome advances, that might support a hostile work environment claim.

the allegations about Crawford and Porter also fail to make any connection between the alleged misconduct and Sanders's sex.

In any event, Sanders makes *zero* attempt in her response brief to rebut the CTA's argument that the Amended Complaint does not connect the alleged harassment to Sanders' sex. *See* R. 29, Pl.'s Resp. Br. at 3; *Alito v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011). What the Court analyzed just earlier was not presented by Sanders in her response brief. Instead, the response brief only says that "this court has construed as being 'hostile' what a reasonable person would view as hostile and what a [p]laintiff sees as abusive." Pl.'s Resp. Br. at 3. Sure, this is an accurate statement of the law on whether the harassment was so severe or pervasive that it altered the conditions of employment and create a hostile work environment. But that passes the CTA's argument like a ship in the night; the CTA argued that Sanders had not adequately alleged that the harassment she experienced at the hands of Irby, Crawford, and Porter was *because of* her sex. Absent a response to that argument, and in light of the analysis described above, the hostile work environment claim is dismissed. This dismissal is with prejudice given that the complaint has already been amended and given the failure to respond to the CTA's argument (so the Court has no reason to think that Sanders has more allegations to offer on this claim).

### 3. Retaliation

The CTA also moves to dismiss Sanders's retaliation claim. Mot. Dismiss. ¶ 9. As mentioned earlier, Sanders does not specify the statute under which she is bringing the retaliation claim, but Title VII is the sensible choice. In order to state a claim for retaliation under that statute, Sanders must allege that she (1) engaged in

a protected activity and (2) was subjected to retaliation as a result of engaging in that activity. *Huri*, 804 F.3d at 833. For the reasons explained below, Sanders states a plausible retaliation claim.

To start, Sanders alleges that she was fired for making a complaint to the EEOC. Am. Compl. ¶¶ 92-96. Indeed, the Amended Complaint refers to this claim as "Retaliatory Discharge," and within the count, Sanders refers to her exercise of the "right to file the charges of harassment and sexual harassment," thus drawing a connection between her harassment complaints and her firing. *Id.* ¶ 93. It is "beyond dispute" that filing EEOC charges and internal complaints regarding sexual harassment counts as protected activity for Title VII retaliation purposes. *Huri*, 804 F.3d at 833; *see also Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 933 (7th Cir. 2017). The timing matches up, too. In the April 2019 EEOC charge, Sanders alleged that she was subjected to sexual harassment. Sanders was fired soon after— later that month—and alleges that the CTA did not follow its progressive discipline policy when firing her and that Winston, whose advances she rejected, was motivated to have her fired. Am. Compl. ¶¶ 68-70. The timing and circumstances, as Sanders alleges them, make it plausible that the filing of the April 2019 EEOC complaint was the real reason for the termination. *See Hatcher v. Bd. of Trs. of S. Ill.*, 829 F.3d 531, 537-38 (7th Cir. 2016), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Backing up in time from the discharge itself, Sanders alleges another set of retaliatory conduct that she suffered. For retaliation claims, an "adverse employment

action simply means an employer's action that would dissuade a reasonable worker from participating in protected activity." *Huri*, 804 F.3d at 833. In other words, *anything* that would deter a reasonable person from participating in protected activity is considered an adverse employment action for purposes of a retaliation claim. And here, reading the Amended Complaint in Sanders's favor, there is a second plausible retaliation story: that Sanders reported Winston's unwelcome advances to the CTA and then, in retaliation, coworkers and managers who were friends with Winston targeted her to be bullied. Specifically, Sanders alleges that, in September 2018, she made an internal complaint about Winston's unwelcome advances to a CTA manager as well as to her union representative. Am. Compl. ¶ 57. Then, in December 2018, she was verbally and physically assaulted by Crawford, who was allegedly friends with Winston. *Id.* ¶ 62. So at the very least, Sanders has alleged a plausible story that Crawford retaliated against her for lodging an internal complaint against Winston; making an internal complaint is a protected activity, and verbal and physical assault would certainly dissuade a reasonable person from making such a complain. Indeed, in the April 2019 EEOC charge (which, remember, was even before she got fired), Sanders alleged that she complained to the CTA, was subjected to harassment after complaining, and was retaliated against for engaging in protected activity. April 2019 EEOC Charge. So here, too, she has stated a plausible retaliation claim. *Huri*, 804 F.3d at 833.

One final note on the retaliation claim. In addition to the December 2018 assault by Crawford, Sanders also alleges more generally that she was subjected to

an increase in bullying behavior from Crawford, as well as hostile stares from Porter. Am. Compl ¶¶ 49-50. She alleges that this behavior occurred *after* she rejected Winston's unwelcome advances and perceived a shift in Winston's demeanor toward her in August 2018. *Id*. ¶¶48-49. But beyond that, the timing gets fuzzy. Specifically, the Amended Complaint is far from clear about when Sanders first *reported* Winston's behavior to the CTA (which is the relevant inquiry) and also when the "increased" bullying and hostile stares started happening. *Id*. ¶¶49-50. As mentioned above, she does clearly allege that she had reported the unwelcome advances to a CTA manager and her union representative in September 2018. *Id*. ¶ 57. So, if the bullying and hostile stares happened *after* that September 2018 meeting, then those behaviors can also be encompassed in her retaliation claim based on her internal complaints about Winston's unwelcome advances. On the other hand, if it turns out that the bullying and hostile stares occurred *before* her September 2018 meeting, then they cannot be part of the retaliation claim. The exception, of course, is if September 2018 was not the first time she complained about unwelcome advances, and that the bullying and hostile stares in fact occurred after her initial report. There is at least some suggestion that that might be the case; Sanders alleges that at the September 2018 meeting, she "*again* raised … the unsolicited advances by Mr. Winston." *Id*. ¶ 57 (emphasis added). Her use of the word "again" suggests that she had also complained about the unwelcome advances before that September 2018 meeting. Of course, if it turns out in discovery that the behavior of Crawford and Porter was in response to something else—in other words, if the bullying and hostile stares occurred *before* she

first made any complaint about the unwelcome advances to the CTA—then this would cease to be the basis for a plausible retaliation claim.

In any event, as explained above, Sanders has sufficiently stated a claim for retaliation in the form of the firing, as well as the verbal and physical assault by her coworker and other mistreatment after she lodged an internal complaint with the CTA about Winston's unwelcome advances. The retaliation claim will move forward.

### 4. Disparate Treatment

Finally, although Sanders does not expressly plead a disparate treatment claim, it bears mentioning that any claim like that would also fail on these allegations. To state a claim for disparate treatment, a plaintiff "must allege that an employer took job-related action against [her] which was motivated by intentional discrimination." *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017). Here, in general support of her Title VII claims, Sanders alleges that she is an African-American woman, which entitles her to protection under Title VII for both her race and sex. Am. Compl. ¶ 74. Beyond that, Sanders does not really discuss race, and she only discusses sex discrimination in the context of the hostile environment claim and the retaliation claim. Nonetheless, the CTA preemptively argues that any claims of disparate treatment on the basis of race and sex should be dismissed. Mot. Dismiss ¶ 7; R. 25, Def.'s Br. at 6.

The CTA primarily argues that if these claims are being raised, then Sanders has failed to exhaust her administrative remedies because (1) neither of the EEOC charges mentions Sanders's race at all; and (2) the EEOC charges only discuss sex in the context of harassment and sexual harassment, not disparate treatment. Def.'s

13

Resp. Br. at 7. The Court agrees when it comes to race. To the extent that Sanders is attempting to plead a disparate treatment claim based on race, she has failed to exhaust her administrative remedies. In order to bring a lawsuit under Title VII, a plaintiff must first exhaust her administrative remedies by filing a charge of discrimination with the EEOC. 42 U.S.C. § 2000e–5(f)(1); *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019). A plaintiff "may bring only those claims that were included in her EEOC charge, or that are like or reasonably related to the allegations of the charge." *Chaidez*, 937 F.3d at 1004 (cleaned up). To determine whether the allegations are "reasonably related" to those in the EEOC charge the Court looks to factors such as the factual relationship between the allegations and whether the current claim reasonably could have developed from the EEOC's investigation of the charges before it. *Sommerfield v. City of Chi.*, 863 F.3d 645, 648 (7th Cir. 2017).

On the April 2019 EEOC charge form, Sanders checked just two boxes when listing the forms of discrimination: sex and retaliation. In the section that asked for the particulars of the discrimination, Sanders referred only to sex and retaliation:

> During my employment, I have been subjected to harassment and sexual harassment. I complained to Respondent. Subsequent to my complaint, I have been further harassed.

> I believe I have been discriminated against because of my sex, female, and in retaliation for engaging in protected activity … .

April 2019 EEOC Charge. The charge does not mention racial discrimination at all, so any disparate treatment claim based on race (to the extent that one is being alleged) fails at this stage. Same goes for any other potential claim rooted in racial discrimination, such as hostile work environment based on race. Although the

14

individuals implicated by the April 2019 EEOC charge may be the same ones implicated by the Amended Complaint, it is not fair to say that Sanders's EEOC charge is "reasonably related" to a racial discrimination claim. *Chaidez*, 937 F.3d at 1004. An investigator trying to address the EEOC charge would only reasonably consider sex discrimination, sexual harassment, and retaliation, as those are the only things that Sanders mentions. A primary reason for requiring administrative exhaustion is to put the employer on notice of potential claims, and Sanders's EEOC charge would not provide notice of a racial discrimination claim. *Id*. Sanders has failed to exhaust her administrative remedies for any racial discrimination claim she might be making in her Amended Complaint.

It is worth noting, however, that even if she had exhausted her administrative remedies, the Amended Complaint as it stands would still not state a racial discrimination claim. *See Tomayo v. Blagojevich*, 526 F.3d 1074, 1081 n.2 (7th Cir. 2008) (describing that the pleading requirement for a race discrimination claim, while minimal, still requires a plaintiff to state that an adverse employment action was taken against her because of her race). The paragraph the CTA looks to as potentially evoking this claim—the one stating that Sanders is afforded protections under Title VII because of her race—is ambiguous, and the only factual allegation related to Sanders's race is Irby's comment that Sanders acted "proper, like she was a white female." *See* Am. Compl. ¶¶ 11, 74. Beyond that, there is no suggestion of an adverse employment action taken because of her race. Further, Sanders fails to mention race at all in her response to the CTA's motion to dismiss, again effectively waiving any

racial discrimination claim by not rebutting the CTA's argument. *See Altio*, 651 F.3d at 721.[5] Thus, to the extent that Sanders has tried to allege a disparate treatment claim based on race, that claim must fail.

As for disparate treatment based on sex, the CTA again argues that this claim should be dismissed because Sanders failed to exhaust her administrative remedies. Def.'s Br. at 6. This one is less clear. The April EEOC charge does generally say that she is making a claim of "sex discrimination," April 2019 EEOC Charge, so the Court cannot say for sure at this point that a claim for disparate treatment on the basis of sex would not be related to that charge on these facts. *See Chaidez*, 937 F.3d at 1004.

That being said, any potential disparate treatment claim based on sex would also fail as a substantive matter because Sanders again does not identify an adverse employment action that was taken *because of* her sex. All of the adverse treatment Sanders alleges in her Amended Complaint is connected to either the hostile work environment claim or the retaliation claim—and as the Court explained above, the retaliation claim will go forward because she did sufficiently allege a connection between her termination and her EEOC complaint—but there no basis for a disparate treatment claim here. So, to the extent that Sanders has tried to allege a disparate treatment claim based sex, that too must fail.

---

[5]Sanders does use the word "race" one time in her response by stating that she "can address any perceived deficiencies in her Section 1983 race claims by pleading more facts," but this appears to be a mistake because Sanders's § 1983 claim makes no mention of race. *See* Pl.'s Resp. Br. at 2; Am. Compl. ¶¶ 85-91.

### B. *Monell* Claim

In addition to the Title VII claims, Sanders also brings a claim against the CTA under 42 U.S.C. § 1983. Under *Monell v. Department of Social Services of New York*, a municipality (or a municipal agency like the CTA) can be held liable on a § 1983 claim only "when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible for under § 1983." 436 U.S. 658, 694 (1978). To state a *Monell* claim against the CTA, Sanders must allege: (1) the deprivation of an underlying substantive constitutional right; (2) the existence of an official policy or other governmental custom; and (3) that this policy or custom was the moving force behind the deprivation of her substantive constitutional rights.[6] *See Teesdale v. City of Chi.*, 690 F.3d 829, 833 (7th Cir. 2012). For the reasons explained below, Sanders has not adequately alleged the existence of a policy or custom, so the *Monell* claim against CTA is dismissed with prejudice.[7]

In order to adequately allege the existence of an official policy or custom, Sanders must point to (1) an express policy that, when enforced, caused a constitutional violation; (2) a widespread practice that, although not authorized by written law or express municipal policy, constituted a custom or usage with the force

---

[6]The parties have not really briefed the "constitutional deprivation" element of the *Monell* claim, but generally, "sexual harassment constitutes sex discrimination in violation of the equal protection clause and is actionable under § 1983." *Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014) (quoting *Bohen v. City of E. Chi., Ind.*, 799 F.2d 1180, 1185 (7th Cir. 1986). So, for the purposes of this motion, the Court assumes that this element is met.

[7]As mentioned earlier, Sanders's response brief refers to § 1983 race claims. Pl.'s Resp. Br. at 2. To the extent that she is asserting a *Monell* claim based on racial discrimination, that too must fail because she has failed to state a policy or a practice of racial discrimination in the Amended Complaint.

of law; or (3) a constitutional injury by a person with final policymaking authority. *McTigue v. City of Chi.*, 60 F.3d 381, 382-83 (7th Cir. 1995). Sanders alleges that CTA had a widespread practice, constituting a custom, of "condoning the sexual misconduct of its managers" despite having policies against such misconduct. Am. Compl. ¶ 90. To support this, she refers to Winston's misconduct towards her specifically, *id.*, but also alleges that Winston had at least one other allegation of sexual misconduct against him, *id.* ¶ 61, and that she "heard a lot of talk among co-workers that sexual harassment was rampant in the CTA environment," *id.* ¶ 14.

The CTA argues that the *Monell* claim should be dismissed because Winston's behavior alone cannot trigger municipal liability, and simply stating that there is a custom beyond Winston's behavior does not adequately allege that a custom existed. Def.'s Br. at 8-9. Sanders responds by arguing that a heightened pleading standard is not required for § 1983 claims, and that she has adequately alleged that sexual harassment is prevalent across CTA's locations. Pl.'s Resp. Br. at 2-3.

It is certainly true that there is no absolute requirement that a *Monell* claim must be supported by allegations of multiple constitutional violations in order to survive a motion to dismiss. *See e.g. White v. City of Chi.*, 829 F.3d 837, 844 (7th Cir. 2016). But there still must be enough factual information in the Amended Complaint to "nudge[ ] [the] claim[ ] across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The substantive bar for proving a municipal custom is quite high, and that informs the Court's determination of whether this is a plausible claim. *Id. See also Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014)

("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice."); *McTigue*, 60 F.3d at 382-83 (holding that allegations of a municipal policy without any factual support are merely legal conclusions).

Here, Sanders has pointed to sexual misconduct on the part of one supervisor, Winston. *See* Am. Compl. ¶ 90; Pl.'s Resp. Br. at 2. Moreover, Winston is not a final policymaker, and it would be too far of a logical jump to conclude that one supervisor being the subject of one (or perhaps more than one) allegation of sexual misconduct translates to a widespread municipal practice of ignoring sexual misconduct claims. Although Sanders does assert that she heard about other instances of sexual misconduct in the CTA environment, Am. Compl. ¶ 14, that single paragraph alone cannot carry this claim. That vague allegation sounds more like a rumor than concrete allegations of a widespread practice that would be necessary to make this a plausible claim. *See McTigue*, 60 F.3d at 383. In other words, while it may be *conceivable* that the CTA had a custom of ignoring sexual harassment allegations and the Winston incident was merely one example of it, that one example does not give rise to a *plausible* inference of a municipal custom. Sanders's allegations are much more specific to her experience, rather than suggestive of a widespread custom. For these reasons, the *Monell* claim is dismissed.

### C. Emotional Distress

Finally, the CTA moves to dismiss Sanders's state law claim for intentional infliction of emotional distress because, according to the CTA, this claim is preempted

by the Illinois Human Rights Act. Mot. Dismiss ¶ 10. Under Section 8-111(D) of the Human Rights Act, "no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8-111(D). "[T]he Act does not call for preemption in the broader sense that all claims *arising* out of an employment relationship are precluded." *Richards v. U.S. Steel*, 869 F.3d 557, 563 (7th Cir. 2017) (emphasis in original). Rather, when the tort claim is "inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the Act itself" then the Court should dismiss the claim so that it may be brought before the Illinois Human Rights Commission. *Id.* at 564 (quoting *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23 (Ill. 1997)). So, the question is whether Sanders can state an emotional-distress claim without relying on the legal duties created by the Human Rights Act. *Id.* As explained next, the answer here is no.

Sanders herself acknowledges that her claim is primarily founded on duties established by the Human Rights Act. Specifically, the CTA's duty to not discriminate, not engage in sexual harassment, and not retaliate are all established by the Act. 775 ILCS 5/2-102(A) (It is a civil rights violation "[f]or any employer to refuse to hire, to segregate, to engage in harassment … or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination."); 775 ILCS 5/2-102(D) (It is a civil rights violation "[f]or any employer, employee, agent of any employer,

employment agency or labor organization to engage in sexual harassment."); 775 ILCS 5/6-101(A) (It is a civil rights violation to "retaliate against a person because she has opposed that which she has reasonably and in good faith believes to be … sexual harassment in employment.").

In the Amended Complaint, Sanders asserts that the CTA's violation of her right to be free from discrimination and retaliation caused her emotional harm. Am. Compl. ¶ 98-99. And in her response brief, she reaffirms this assertion by alleging that her emotional harm stemmed from "her refusal to comply with the demands of Mr. Winston" and retaliation from CTA. Pl.'s Resp. Br. at 4. Also, she acknowledges that the emotional distress claim "is a natural outgrowth of her subjection to an intentionally hostile work environment culminating in her discharge." *Id.* at 3. In doing this, Sanders essentially concedes that all of the allegations of emotional harm are linked to the CTA's breach of duties created by the Human Rights Act—precisely the type of claim that the Act preempts. *See Richards*, 869 F.3d at 564. For these reasons, the emotional-distress claim is preempted by the Human Rights Act and must be dismissed.

And even if the emotional-distress claim were not preempted, the allegations would still fail on the merits because they do not seem to rise to the level of "extreme and outrageous" conduct independent of the Human Rights Act. Under Illinois common law, an emotional distress claim (1) must be premised on misconduct that is truly extreme and outrageous; (2) requires that the defendant intended to inflict severe emotional distress or at least knew there was a high probability of emotional

distress; and (3) the misconduct, in fact, caused severe emotional distress. *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003). It is true that a determination of whether conduct is "extreme and outrageous" is typically a question for a later stage in litigation or for a jury. But the conduct that Sanders points to as the basis for her emotional distress claim is simply not "so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society." *Id*. at 83.

Here, Sanders claims that "[t]he conduct by Defendant in creating a customary practice of violating its express policies and procedures" caused her emotional harm. Am. Compl. ¶¶ 98-99. Separately, Sanders alleges facts about unwelcome sexual advances from her supervisor and retaliation which she claims caused her emotional harm. *Id*. ¶ 8. Accepting everything Sanders has asserted as true, as despicable as all of that conduct is, it does not qualify as extreme and outrageous given the high hurdle that Illinois common law sets and the general reluctance to deem workplace behavior as extreme and outrageous. *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006) ("[I]f everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action.").

Finally, it is worth mentioning that Sanders would also need to establish some sort of vicarious liability on the part of the CTA because there is no strict liability for the actions of employees under Illinois common law. *Richards*, 869 F.3d at 565. Sanders does not address this at all, but rather reiterates the requirements for finding an *individual* liable for intentional infliction of emotional distress, focusing

primarily on Winston's unwelcome sexual advances. Pl.'s Resp. Br. at 4-5. Under Illinois common law, however, the CTA can only be liable for Winston's individual misconduct if it was committed within the scope of his employment. *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 467 (7th Cir. 2016). Sanders does not address this issue at all. For all of these reasons, Sanders has failed to allege intentional infliction of emotional distress, so this claim is also dismissed with prejudice.

### D. Punitive Damages

The CTA also asks to strike the request for punitive damages from the Amended Complaint because Sanders cannot recover punitive damages as a matter of law. Mot. Dismiss ¶ 13. The CTA is right. Only the Title VII claims will be moving forward in this case, and under Title VII, a plaintiff cannot recover punitive damages against a municipal agency such as CTA. 42 U.S.C. § 1981a(b)(1). In addition, Sanders herself has disavowed any request for punitive damages. Pl.'s Resp. Br. at 6 ("Plaintiff does not seek punitive damages against the CTA."). Because Sanders has conceded that she is not seeking punitive damages, and because there would be no legal basis to award them if she were, the motion to strike is granted.

### IV. Conclusion

The CTA's motion to dismiss is granted in part and denied in part. The claims for unwelcome sexual advances and retaliation remain intact. But the *Monell* claim is dismissed with prejudice, as are the claims for hostile environment based on sex, disparate treatment based on race and sex, and intentional infliction of emotional distress. The parties shall confer and file a joint status report proposing the discovery schedule by September 17, 2020. The status hearing of September 18, 2020, is reset

23

to September 25, 2020, at 8:30 a.m., but to track the case only (no appearance is required, and the case will not be called). Instead, the Court will set the schedule based on the written report.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 3, 2020