UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHANEISE N. SANDERS, ) | |
| ) | |
| Plaintiff, ) | Case No. 1:19-CV-04656 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| CHICAGO TRANSIT AUTHORITY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Shaneise Sanders brought this employment discrimination lawsuit against her former employer, the Chicago Transit Authority.[1] R. 16, Am. Compl. ¶¶ 1, 6. Following CTA's motion to dismiss, Sanders' only remaining claims are for unwelcome sexual advances and Title VII retaliation. R. 80, DSOF ¶ 74. CTA now brings a motion for summary judgment against the remaining claims. R. 79, Def.'s Mot. for Summ. J. ¶ 5. Sanders primarily responds by pointing to the conduct of supervisor Anthony Winston as qualifying as severe or pervasive harassment, and that the timing of her firing was suspicious after she complained about the harassment. R. 88, Pl.'s Resp. Br. at 3, 6, 8. For the reasons explained in this Opinion, however, those arguments unfortunately are meritless, and the CTA's motion for summary judgment is granted in its entirety.

---

[1]This Court has subject matter jurisdiction over the federal claims in this case under 28 U.S.C. § 1331. Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

# I. Background

In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). So Sanders gets the benefit of all reasonable inferences. The facts below are undisputed unless otherwise noted.

## A. Initial Communications With Winston

In April 2018, Sanders began working for the CTA as a Customer Service Assistant. DSOF ¶ 3, 5. Soon after starting the job, Sanders began having conflicts with her coworkers. Am. Compl. ¶¶ 9–13. For example, coworker Tamara Irby said that Sanders acted "proper, like she was a white female." *Id.* ¶ 11. A few months later in June 2018, Sanders and Irby got into an argument, which escalated into Irby snatching a phone from Sanders and threatening to harm her. DSOF ¶ 7. Later that month, Sanders had a meeting with her supervisors and a union representative to discuss the altercation. R. 90, PSOF ¶ 2.

Very soon after the meeting, Sanders met Anthony Winston, a senior manager at the CTA. DSOF ¶¶ 7–8. Winston approached Sanders, who was visibly upset, and suggested that they "hang out for drinks." PSOF ¶ 3, Sanders Dep. 174:22-23; DSOF ¶ 8–10, Sanders Dep: 127:20–128:8. Sanders declined Winston's offer, but instead gave him her phone number. PSOF ¶ 4; DSOF ¶ 10. In July 2018, Winston texted Sanders, asking for a photo of Sanders for his screensaver; the text request was followed by the winking and kissing emoticon. DSOF ¶ 11. Over the course of the next

two months, Winston made multiple attempts to meet with Sanders both in public and in his home. Am. Compl. ¶¶ 21, 27, 29–30.

The CTA alleges that Winston and Sanders planned to meet up at a restaurant in Calumet Park with Sanders' friends. DSOF ¶ 14. But at some point, when the two talked on the phone about meeting up, Winston invited Sanders over to his house. *Id.* ¶ 15. Sanders disputes this, alleging that there was never a plan for the two to meet up, but rather that when Winston invited her over to his house, Sanders declined the invitation, explaining that she does not "come over to guys' houses and have drinks with them." R. 89, Pl.'s Resp. DSOF ¶ 14. Sanders instead invited Winston to come out with her and her friends at the Calumet Park restaurant. *Id.*. Winston told Sanders to contact him after she was done eating; Sanders did so and called Winston after 11 p.m. DSOF ¶ 17. The two never met up that evening, but the next day Sanders texted Winston "Good Morning," and also admonishing, "you was [sic] supposed to meet up with me." *Id.* ¶ 18. From this point on, neither Sanders nor Winston alleges that either made more attempts to meet up.

In August 2018, Sanders called Winston to report an incident at work with Patrick Cimarusti, a maintenance manager. PSOF ¶ 6. When Ashley Cooper, the manager Sanders would typically report to, was not present, Winston was available as the manager to which Sanders would report. *Id.* Sanders notes that, at this time, Winston's demeanor towards her had changed; indeed, when she was describing the situation with Cimarusti, Winston simply hung up on her. PSOF ¶ 7.

3

## B. Internal EEO and External EEOC Complaints

Due to Winston's alleged change in behavior, Sanders filed an internal EEO complaint and also reported the behavior to her union representative. PSOF ¶ 8. Cooper, Sanders' manager, was made aware of the EEO complaint by Van Johnson, a CTA employee who worked in the EEO department. *Id.* It should be noted here that the CTA points out that neither Sanders' internal EEO complaint nor her complaint to the union mentioned Winston's earlier text messages. R. 92, Def.'s Resp. PSOF ¶ 8. Instead, Cooper testified (without genuine dispute from Sanders) that Sanders' EEO complaint alleged that she was bullied and harassed—but did not mention Winston. *Id.* Sanders had scheduled meetings with the CTA's EEO unit on September 13, 2018, and October 2, 2018—and in the second meeting, Sanders disclosed that she had filed a Charge of Discrimination with the Equal Employment Opportunity Commission on October 1. DSOF ¶ 63. As a result, the CTA closed the internal EEO complaint because of the external filing. *Id.*

On April 2, 2019, Sanders filed another Charge of Discrimination with the EEOC and received a right-to-sue letter less than a week later, on April 8, 2019. DSOF ¶ 67. Backtracking in time, it was not until December 2018 that Van Johnson, of the CTA's EEO unit, became aware of Sanders' allegations against Winston. *Id.* ¶ 64. Johnson interviewed Sanders on January 18, 2019, where Sanders explained that she and Winston had mutually exchanged numbers, that she filed an external complaint, and that she no longer interacted with Winston. *Id.* ¶¶ 65–66.

### C. Alleged Retaliation

Sanders alleges that Jeannie Alexander, who was a CTA General Customer Service Manager, told her that Winston and Richard Porter, Senior Manager of Customer Service who was later promoted to Acting General Manager, recommended discipline against Sanders in September 2018, but that Alexander concluded that there was no reason to discharge Sanders. PSOF ¶ 9. The CTA disputes this, alleging that the records do not even establish that Winston and Porter recommended discipline against Sanders. Def.'s Resp. PSOF ¶ 9. The CTA further responds that the 2018 recommendation for discharge was submitted by a different manager, Taniedra Allen. *Id.*

In any event, Sanders' conflicts with coworkers continued. Alina Ali conducted the internal EEO investigation. PSOF ¶ 10. Sanders alleges that the same day that she communicated via email with Ali about the EEO charges, Winston and Porter "both came to the station and made their presence known to her"; Porter was staring Sanders down and Winston allegedly stood in her way. *Id.* In November and December 2018, Sanders had incidents with two other coworkers, Reggie Watts and Nakia Crawford. *Id.* ¶¶ 11–12.

In December 2018, Sanders took a leave of absence and applied for short-term disability, but Sedgwick (the CTA's third-party, private-vendor administrator for disability claims) denied the claim on January 2, 2019. DSOF ¶¶ 46–47. Sanders appealed the decision, but on February 25, 2019, the appeal was denied. *Id.*

5

There are two CTA policies relevant to Sanders' termination. The first is Rule "14(I) Personal Conduct," which concerns excessive absenteeism. DSOF ¶ 38. The second policy concerns when a CTA employee is absent without official leave (AWOL); if an employee is AWOL, then a letter called a "5-day letter" is sent "to inform the employee that they are not in compliance with CTA's leave policy and must report for duty." *Id.* ¶ 40. The CTA has a progressive disciplinary policy, which is implemented through the Corrective Action Guidelines—if an employee is AWOL or has excessive absenteeism, then those issues are addressed by the Guidelines. *Id.* ¶ 41. Every day of absence without approved leave is considered one infraction of AWOL; under the Guidelines, the second infraction of AWOL "yields to referral to General Manager with a recommendation for discharge." *Id.* ¶ 43.

The CTA relies on the Corrective Action Guidelines to allege that an employee who receives a 5-day letter and fails to report to work by the deadline will be considered AWOL. DSOF ¶ 44. Sanders disputes this, arguing that there is no causal relationship between the letter and being considered AWOL. Pl.'s Resp. DSOF ¶ 44. The CTA also points to the Guidelines to explain that unexcused absences where the employee fails to contact their immediate supervisor by the end of their shift may be considered a violation for excessive absenteeism. DSOF ¶ 45. Sanders also disputes this, arguing that "unexcused absence" is not qualified in the cited material in the way that the CTA does here. Pl.'s Resp. DSOF ¶ 45.

On March 7, 2019, Cooper sent Sanders a 5-day letter instructing her to report to work by March 15, 2019, and that if she cannot report in person, then "she must

6

provide documentation no later than March 15, 2019 to substantiate her reason for not reporting." DSOF ¶ 48. Sanders disputes ever receiving this March 7 letter. Pl.'s Resp. DSOF ¶ 48. Sanders also alleges that other disciplinary steps for excessive absenteeism are required before sending the 5-day letter, including (1) a written warning, (2) final written warning and one-day suspension, (3) corrective case interview and three-day suspension/probation, and (4) referral to general manager with recommendation for discharge. PSOF ¶ 17. CTA disputes that these steps needed to be followed before Sanders' discharge, offering evidence that each day of absence constitutes another AWOL violation. Def.'s Resp. PSOF ¶ 17. Sanders also alleges other disciplinary steps for being AWOL were required before sending the 5-day letter, namely, (1) three-day suspension/probation and (2) referral to general manager with a recommendation for discharge. *Id.* ¶ 19. CTA again disputes that these steps needed to be followed.. *Id.* ¶ 17.

On April 15, 2019, Sonya Hargrove, an administration manager, recommended to Porter that Sanders be discharged for being AWOL and for excessive absenteeism.. Pl.'s Resp. DSOF ¶ 50. When Hargrove realized that there was no authorized recipient available for the first 5-day letter, she sent to Sanders another 5-day letter on April 17, 2019, requesting that Sanders substantiate her unexcused absences no later than April 23, 2019. DSOF ¶ 50; Def.'s Resp. PSOF ¶ 14.

Sanders reported to work on April 22, 2019, but Cooper demanded that Sanders return her CTA equipment. PSOF ¶ 15. There is some dispute as to the timing of when Cooper demanded the CTA equipment be returned. Def.'s Resp. PSOF ¶ 15.

7

Sanders provided to the CTA the same medical records that she had presented to Sedgwick when applying for disability leave (remember that Sedgwick denied the leave). DSOF ¶ 51. Sanders alleges that the CTA failed to follow their own procedures for addressing excessive absenteeism. PSOF ¶¶ 17–21. The CTA disputes this, alleging that Sanders was informed about her absence through other means, such as the denial of her requested leave and the denial of her corresponding appeal. Def.'s Resp. PSOF ¶ 21. On April 22, 2019, Sanders was discharged by Acting General Manager Richard Porter for (in the CTA's view) being AWOL and excessive absenteeism in violation of CTA's General Rules. DSOF ¶ 53.

The relevant decisionmakers involved in the termination decision were Ashely Cooper, Sonya Hargrove, and Richard Porter. DSOF¶¶ 32, 35. In late August 2018, Sanders filed a complaint with CTA's EEO unit. *Id.* ¶ 62. Sanders filed a charge of discrimination with the Equal Employment Opportunity Commission in early October 2018. *Id.* ¶ 63. The CTA closed its internal investigation because of Sanders' external filing, in accordance with CTA policy. *Id.* It was not until December 2018 that Van Johnson (from CTA's EEO unit) became aware of Sanders' allegations against Winston. *Id.* ¶ 64. Johnson was not initially involved in the investigation stemming from Sanders' late August internal complaint. DSOF ¶ 64 (citing R. 80-2, Exh. 17 Van Johnson Aff., ¶ 6 On April 2, 2019, Sanders filed another Charge of Discrimination with the EEOC. *Id.* ¶ 67.

8

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Unwelcome Sexual Advances

To succeed on a claim of unwelcome sexual advances, a reasonable jury must be able to find that the plaintiff (1) was subjected to unwelcome sexual advances; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is basis for employer liability. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005). Whether a hostile work environment existed must be analyzed through both an objective and subjective lens. *Id.* "In determining whether the environment was objectively hostile, a court must consider all of the circumstances, including the frequency and severity of the conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." *Id.*

The Supreme Court has cautioned courts to take into account the imbalance in power in a supervisor-employee relationship when assessing "whether [the] respondent by her conduct indicated that the alleged sexual advances were unwelcome[.]"*Meritor Sav. Bank, FSB v. Vinson*, 477 US 57, 68 (1986). In *Meritor*, the Court made the crucial point that an employee's so-called "voluntary" participation in the alleged sexual episodes is not the proper focus of the inquiry in determining whether the sexual advances were unwelcome. *Id.* The "correct inquiry" is whether the employee's conduct "indicated that the alleged sexual advances were unwelcome," not whether later participation in sexual activity was "voluntary." *Id.* As explained next,

10

however, even with this proper focus in mind, no reasonable jury could conclude that the conduct at issue here was severe or pervasive enough based on current case law. Nor is there a basis for employer liability.

### 1. Unwelcome Sexual Advances

First, on whether Winston made unwelcome sexual advances that qualify as harassment under Title VII, Sanders falls short of satisfying both the subjective and objective elements. With regard to her subjective reaction, Sanders does not offer evidence that she ever felt uncomfortable because of Winston's text messages or invitations to meet up. In her own deposition, Sanders testified that she "didn't really think much of it at the time" in reference to Winston's text messages and that she "disregarded it, [she] ignored it.".. DSOF ¶ 12 (citing R. 80-2, Exh. 3 Sanders Dep. 173:14-15, 172:10-17). Nor did Sanders mention the text messages or Winston's invitations in her internal EEO complaint. DSOF ¶ 57, 62; Def.'s Resp. PSOF ¶ 8.

With regard to the objective element, although Winston's position as a supervisor ought to have caused him to show much more restraint, the record evidence does demonstrate a mutual intent to meet up. To be sure, Winston outright invited Sanders to his home, and asked for her photo with a kissing-and-winking emoticon. Am. Compl. ¶ 24; Pl.'s Resp. DSOF ¶ 14. So when Sanders invited Winston to come out with her friends to the Calumet Park restaurant, in isolation a reasonable jury could very well conclude that this was a deflection of an unwelcome invitation for Sanders to come over to his house. Pl.'s Resp. DSOF ¶ 14. Sadly, it is not uncommon for subordinate employees to have to deploy deflection strategies like that against the

11

advances of supervisors. Here, however, the record shows that it was Sanders who then called Winston later that night, and then it was Sanders who followed up with him by text the next day, reminding him that they were supposed to meet up. DSOF ¶¶ 17–18.

Against this, Sanders argues that Winston's demeanor toward her changed after the failed attempt to arrange the meeting. Pl.'s. Resp. Br. at 4. But that after-the-fact change does not speak to whether the advances were unwelcome (though the change in demeanor could be relevant to whether the work environment was severe or pervasive). element. It is Sanders' response, particularly if her behavior reflects "concern over [Winston's] actions and an unwillingness to tolerate further harassment," that is important for understanding if the sexual advances were unwelcome. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000) (cleaned up).[2] The record simply does not support a finding that, under the current case law, Winston made unwelcome sexual advances, either as a subjective or objective matter.

### 2. Severe or Pervasive Conduct

Even if there were enough evidence to infer that Winston's advances were unwelcome, the severe-or-pervasive element has not been satisfied. To determine whether the conduct at issue was severe or pervasive enough to create a hostile work environment, the key question is whether the misconduct was serious enough to

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

essentially become a *de facto* condition of the workplace. *See Saxton v. American Tel. & Te.Co.*, 10 F.3d 526, 534 (7th Cir. 1993). But it is not required that the misconduct be both severe *and* pervasive; one or the other form of harassment is enough. *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) ("It is important to recall that harassing conduct does not need to be both severe *and* pervasive.") (emphasis in original).

On the subjective reaction to the misconduct, as noted earlier, Sanders does not actually argue that she subjectively perceived the advances themselves to be severe or pervasive. Sanders Dep. 173:14–15, 172:10–17. And objectively, because there appeared to be mutual interest and mutual efforts in the two meeting up, it cannot be said that the advances, under the current case law, were themselves severe or pervasive. The number of invitations from Winston to Sanders, and the content of the invitations, were insufficient to be either severe or pervasive. In another case in which two dinner invitations from an employee's superior were at issue, the Seventh Circuit held that those invitations were too infrequent to qualify as severe or pervasive. *Murray v. Chicago Transit Authority*, 252 F.3d 880, 889 (7th Cir. 2001).

Sanders instead focuses on Winston's changed behavior towards her as evidenced by (1) when he hung up on her and cut her short when discussing the incident with Patrick Cimarusti and (2) Winston's alleged recommendation for discipline against her in September 2018. Pl.'s Resp. Br. at 3–4. Even assuming that Winston's behavior towards Sanders changed because of the failed efforts to meet outside of work, neither of those changes in behavior qualify as sufficiently severe or pervasive

13

(when viewed either singly or in combination). On the abrupt hanging-up of the phone, Sanders did not present any evidence that she even subjectively (let alone objectively) perceived this as distressing or impacting her performance of her job. *See* Pl.'s Resp. Br. at 4. Nor was this conduct severe enough from an objective standpoint, because a manager cutting off an employee or hanging up on them, although rude and unprofessional, does not come close to the severity demanded by the case law.

With regard to Winston's alleged attempt to have her disciplined, again Sanders presents no evidence on how that impacted her subjective state of mind. It is true that, from an objective viewpoint, if Winston did attempt to get Sanders disciplined (and even fired) because of their failed attempts to meet up, that could very well be severe enough conduct to qualify as creating a hostile work environment. Indeed, it comes close to an outright *quid pro quo* type of harassment. Yes, the CTA argues that there are no written records reflecting that Winston recommended discipline against Sanders and that the 2018 recommendation for discharge was submitted by a different manager, Taniedra Allen. Def.'s Resp. PSOF ¶ 9. But remember that Sanders testified that Jeannie Alexander, the General Manager who apparently had authority in the decision-making on the 2018 recommendation (regardless of whoever made the recommendation), told Sanders that Winston had attempted to get her disciplined. PSOF ¶ 9. The CTA contends that Alexander's statement is inadmissible hearsay, Def.'s Resp. PSOF ¶ 9, but that is incorrect. Alexander served in a managerial role and was acting within the scope of that role (at least when the evidence is viewed in Sanders' favor) when Alexander allegedly told Sanders that Winston requested the

14

discipline to be imposed. PSOF ¶ 9. So Alexander's statement can qualify as an admission of a party opponent and thus is not hearsay. Fed. R. Evid. 801(d)(2).

Having said all this, Winston's alleged efforts to get Sanders disciplined or discharged failed.[3] More importantly, to repeat a point made above, Sanders did not offer evidence on the subjective element of this alleged aspect of the hostile work environment. So the harassment claim would fail for lack of severity or pervasiveness.

### 3. Employer Liability

Even if Sanders were to have established that Winston's conduct consisted of unwelcome sexual advances and that the conduct was severe or pervasive, the claim still would fail on the lack of a basis for employer liability. The standards for employer liability for harassment turn on whether the harassment was committed by a supervisor or, instead, by a co-worker. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). Where the alleged harasser is a supervisor, and the supervisor takes a tangible employment action against the employee, then the employer is vicariously (and automatically) liable. *Id.* at 430–31. Here, the CTA's characterization that Winston was not Sanders' supervisor is not exactly right, because Winston was in a managerial role over her when her regular supervisor was not available; indeed, on at least one occasion, Sanders did report to Winston in his managerial role. PSOF ¶ 6. That said,

---

[3]Sanders also refers to two other incidents with coworkers Reggie Watts and Nakia Crawford as evidence that Winston's changes in behavior were responses to Sanders' failure to meet up with Winston. Pl.'s Resp. Br. at 4. But Sanders draws no connection between the incidents with those two coworkers and whether they even knew about Winston's attempted efforts to meet up with Sanders.

15

there is no evidence that Winston took a tangible employment action against Sanders, and he was not one of the decisionmakers involved in Sanders' termination. (As noted earlier, even if Winston attempted to get Sanders disciplined in 2018, no disciplinary action was taken against Sanders at that time.)

Sanders offers another path to employer liability. It is true that an "employer's response to alleged instances of employee harassment must be reasonably calculated to *prevent further harassment* under the particular facts and circumstances of the case at the time the allegations are made." *Jackson*, 474 F.3d at 502 (emphasis in original). Here, however, there is no evidence that Sanders mentioned Winston's advances in her internal EEO complaint. So the CTA could not have prevented the alleged hostile work environment because it was not aware of Winston's misconduct. The only CTA employee who eventually learned of the allegations against Winston was Van Johnson, Manager of Employee Relations, in December 2018. That was after all of the alleged conduct at issue. DSOF ¶ 64.

For all those reasons, the CTA's motion for summary judgment against the claim of unwelcome sexual advances is granted.

### B. Retaliation

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in a statutorily protected activity; (2) the employer took a materially adverse action against the employee; and (3) there is a causal link between the protected activity and the adverse action. *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019). CTA's motion for summary judgment against the retaliation

claim is granted because there are no facts—even viewing the evidence in Sanders' favor—to establish a connection between the EEO and EEOC complaints, her conflicts with coworkers, and her termination.

Here, there is no dispute whether Sanders engaged in a statutorily protected activity. And of course she was fired, so the CTA certainly took a materially adverse action against her. Whether the internal EEO complaint and the two external EEOC complaints caused the CTA to fire her requires an examination of the circumstantial evidence, including "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015).

### 1. Knowledge of Complaints

As a threshold matter, there is insufficient evidence that any of the decisionmakers involved in the decision to fire Sanders knew about the internal EEO complaint. Both Hargrove and Porter testified that they were not even aware of any relationship Sanders may have had with Winston. DSOF ¶ 56. Cooper also testified that Sanders never reported any inappropriate conduct by Winston to her. DSOF ¶ 57. It is true that Cooper did become aware of Sanders' internal EEO filing at some point, because Van Johnson told Cooper. PSOF ¶ 8. But there was a seven-and-a-half-month-long gap between the August 31 internal complaint (that Cooper knew about) and Sanders' termination. Without additional evidence supporting a causal and

17

retaliatory link, that is too long of a gap to support a reasonable inference that the termination was retaliation for the internal EEO filing.

Nor is there evidence that the decisionmakers were aware of Sanders' external EEOC filings. *See Nagle v. Vill. Of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) ("In order to establish retaliation pursuant to Title VII, the employer must have had actual knowledge of the protected activity in order for its decisions to be retaliatory; it is not sufficient that an employer could or even should have knowledge about an employee's complaint.") (cleaned up). Given these circumstances concerning lack of knowledge of the protected activity, there is no reasonable inference of retaliation.

### 2. Timing of Discharge

Sanders' best argument on retaliation is the back-and-forth debate between Sanders and the CTA on whether the CTA fully followed its procedures on firing someone for excessive absenteeism or for being AWOL. The April 2019 letter that Hargrove sent to Sanders instructed her to report to work by April 23, 2019. Sanders did report to work on April 22. PSOF ¶¶ 14,15. Yet Sanders was fired on the spot. PSOF ¶ 15. The CTA argues that Sanders "is reading the wrong portion" of the Corrective Action Guidelines. Def.'s Reply at 12–13. The CTA argues that the Guidelines for AWOL violations say that "two instances of being absent without official leave will result in a recommendation for discharge," while the rule for excessive absenteeism "may be a component of an AWOL violation, but an employee is not necessarily AWOL simply by accruing excessive absences." *Id.* at 13. "The main difference is that an employee will accrue an AWOL violation if she accrues an unexcused absence *and*

18

fails to contact her immediate supervisor two hours prior to their shift." *Id.* (emphasis added). The CTA also argues that Sanders fails to present any evidence that the CTA did not follow the relevant Guidelines on excessive absenteeism and AWOL. Def.'s Resp. PSOF ¶¶ 17, 19, 20. It is true, however, that the CTA did send Sanders a 5-day letter with the April 23 deadline, and Sanders met that deadline by reporting to work on April 22.

Having said that, not every employer mishap in following its own procedures is enough, on its own, to allow a jury to reasonably find a retaliatory motive. Here, the CTA's explanation of the termination based on the exceptionally long absence rebuts any inference of pretext. By the time that Sanders finally reported back to work on April 22, 2019, she had been absent from work for *four months*—since December 9, 2018. DSOF ¶ 46. The third-party disability administrator, Sedgwick, had already independently rejected her request for disability leave, yet when she returned to work, she merely presented the same medical documentation that she had submitted to Sedgwick. DSOF ¶ 47. On these facts, the potential departure from the Guidelines is insufficient on its own to justify a reasonable inference of retaliation.

### IV. Conclusion

The CTA's motion for summary judgment is granted as to remaining claims in this case, namely, unwelcome sexual advances and retaliation. The case is dismissed

with prejudice. Final judgment shall be entered. The status hearing of April 15, 2022, is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2022